**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| CLIFFORD E., JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    1:23CV704 |
| | ) |
| MARTIN J. O'MALLEY, | ) |
| Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant.[1] | ) |

**MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Clifford E., Jr., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 12 (Plaintiff's Brief); Docket Entry 13 (Commissioner's Brief); Docket Entry 14 (Plaintiff's Reply); Docket Entries 15, 16, 18 (Commissioner's Suggestions of Supplemental Authority); Docket

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Entry 17 (Plaintiff's Suggestion of Subsequent Authority). For the reasons that follow, the Court will enter judgment for the Commissioner.[2]

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 188-92), alleging a disability onset date of December 24, 2020 (see Tr. 188, 191). Upon denial of that application initially (Tr. 68-75, 86-90) and on reconsideration (Tr. 76-85, 98-107), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 108-09). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 35-67.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 7-27.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 182-87), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2025.

2. [Plaintiff] has not engaged in substantial gainful activity since December 24, 2020, the alleged onset date.

. . .

---

[2] On consent of the parties, this "case [wa]s referred to [the undersigned] United States Magistrate Judge [] to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings therein." (Docket Entry 8 at 1.)

2

3. [Plaintiff] has the following severe impairments: spine disorders, dysfunction of major joints, obesity, and post-traumatic stress disorder (PTSD).

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except [he] is able to frequently interact with supervisors but can only occasionally interact with co-workers and the public. [He] can understand and remember simple instructions. [He] can carry out simple instructions. [He] can deal with occasional changes in a routine work setting.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from December 24, 2020, through the date of this decision.

(Tr. 12-22 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such a] decision . . . is extremely limited."  <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981).  Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the

Case 1:23-cv-00704-LPA   Document 19   Filed 06/24/24   Page 4 of 38

case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u>

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award

---

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantially identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." <u>Id.</u> at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. <u>Id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (<i>e.g.</i>, pain)." <u>Hines</u>, 453 F.3d at 562-63.

7

both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of non-disability on these grounds:

1) "[t]he ALJ's decision violates *Mascio v. Colvin*[, 780 F.3d 632 (4th Cir. 2015)]" (Docket Entry 12 at 4 (bold font omitted)); and

2) "[t]he ALJ failed to identify and provide a reasonable explanation resolving the conflict between the testimony of the VE and the [Dictionary of Occupational Titles ('DOT')] regarding the frequency of changes involved in the jobs cited at [s]tep [f]ive of the SEP" (id. at 9 (bold font and block-formatting omitted); see also Docket Entry 14 at 1-4).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 13 at 4-24.)

---

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

## 1. Argument under <u>Mascio</u>

In Plaintiff's first issue on review, he argues that "[t]he ALJ's decision violates *Mascio*[]" (Docket Entry 12 at 4 (bold font omitted)), because "the ALJ found that [Plaintiff] ha[d] moderate limitations with regards to concentrating, persisting or maintaining pace [('CPP')]" (<u>id.</u> (citing Tr. 15)), but only limited Plaintiff to "following simple instructions" in the RFC (<u>id.</u> at 5 (citing Tr. 16)) and failed to include a limitation that "specifically addresse[d Plaintiff]'s ability to concentrate, stay on task or persist at tasks" (<u>id.</u>). Plaintiff notes that the United States Court of Appeals for the Fourth Circuit held in <u>Mascio</u> "'that an ALJ does not account for a claimant's limitations in [CPP] by restricting the hypothetical question to simple, routine tasks or unskilled work,'" because "'the ability to perform simple tasks differs from the ability to stay on task[, and o]nly the latter limitation would account for a claimant's limitation in [CPP].'" (<u>Id.</u> (quoting <u>Mascio</u>, 780 F.3d at 638 (internal quotation marks omitted)).) Plaintiff concedes that an "ALJ's findings at step two and three [of the SEP] may not automatically require an RFC that imposes additional limitations," but contends that "district courts, including this [Court], have repeatedly held that the ALJ must at least provide a sufficient explanation in the decision to allow the court to determine why no limitations as to [CPP] were included in the RFC [to account for] moderate

9

difficulties in [CPP]." (Id. (citing Scruggs v. Colvin, No. 3:14CV466, 2015 WL 2250890, at *5 (W.D.N.C. May 13, 2015) (unpublished), Reinhardt v. Colvin, No. 3:14CV488, 2015 WL 1756480, at *3 (W.D.N.C. Apr. 17, 2015) (unpublished), Raynor v. Colvin, No. 5:14CV271, 2015 WL 1548996, at *2 (E.D.N.C. Apr. 7, 2015) (unpublished), and Salmon v. Colvin, No. 1:12CV1209, 2015 WL 1526020, at *3 (M.D.N.C. Apr. 2, 2015) (unpublished) (Biggs, J.)).) In Plaintiff's view, although "[t]he ALJ perform[ed] some degree of summarization of the medical evidence" (id. at 6 (citing Tr. 17-18)), he offered "virtually no analysis of th[at] evidence[, and, t]hus, the ALJ form[ed] no 'logical bridge' connecting th[at] evidence to his ultimate conclusions" (id. (quoting Monroe v. Colvin, 826 F.3d 176, 189-90 (4th Cir. 2016))).

The Fourth Circuit has indeed held that "the ability to perform simple tasks differs from the ability to stay on task," and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]," Mascio, 780 F.3d at 638. However, as the Fourth Circuit later affirmed, Mascio held "that an ALJ cannot summarily 'account for a claimant's limitations in [CPP] by restricting the hypothetical question to simple, routine tasks or unskilled work,' . . . [b]ut did not impose a categorical rule that requires an ALJ to always include moderate limitations in [CPP] as a specific limitation in the RFC." Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (emphasis added). As a neighboring district court has explained:

10

> Mascio does not broadly dictate that a claimant's
> moderate impairment in [CPP] always translates into a
> limitation in the RFC. Rather, Mascio underscores the
> ALJ's duty to adequately review the evidence and explain
> the decision . . . . An ALJ may account for a claimant's
> limitation with [CPP] by restricting the claimant to
> simple, routine, unskilled work where the record supports
> this conclusion, either through physician testimony,
> medical source statements, consultative examinations, or
> other evidence that is sufficiently evident to the
> reviewing court.

Jones v. Colvin, No. 7:14CV273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015) (magistrate judge's recommendation adopted by district judge) (unpublished) (emphasis added). Here, the ALJ's decision provides a sufficient explanation as to why the RFC's restrictions to understanding, remembering, and carrying out "simple instructions" and "occasional changes in a routine work setting" (Tr. 16) adequately accounted for Plaintiff's moderate deficit in CPP.

First, the ALJ's consideration of Plaintiff's subjective symptom reports helps to explain why the limitation to simple instructions and occasional changes (see Tr. 16) sufficiently accounted for Plaintiff's moderate CPP limitation (see Tr. 15). In that regard, the ALJ acknowledged 1) the statements of Plaintiff's wife on a Third Party Function Report that Plaintiff "ha[d] some problems completing tasks, concentrating, and paying attention" (Tr. 15 (citing Tr. 241-49)), and 2) Plaintiff's testimony "that his mental health disorders cause[d] symptoms including hypervigilance, low or no motivation, irritability, nightmares, and

11

panic attacks" (Tr. 16), as well as "that he has had some issues with interpersonal interactions in the past and avoid[ed] being out in public" (Tr. 17),[7] but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision" (id.). The ALJ further observed that "[Plaintiff] ha[d] generally failed to note significant issues with concentration at his treatment visits." (Tr. 15 (internal parenthetical citation omitted) (citing Tr. 337-594, 605-791, 805-42).) Moreover, as discussed in more detail below, Plaintiff's challenge to the ALJ's analysis of Plaintiff's subjective symptom reporting misses the mark.

Second, the ALJ's discussion of the mental health treatment evidence bolsters his determination that limitations to simple instructions and occasional changes in the work setting adequately accommodated Plaintiff's moderate deficits in CPP. In that regard, the ALJ made the following, pertinent observations:

- VA "records show[] that [Plaintiff] has generally been stable at follow-up visits concerning his PTSD[,]" as in April 2020, "[he] reported that he was doing 'pretty good,' . . . his sleep had improved, [] he had experienced only one or two nightmares since his previous appointment[,] . . . [and] had normal signs on a concurrent mental status examination" (Tr. 17 (quoting Tr. 784));

---

[7] Notably, Plaintiff did not specifically testify that his PTSD caused him to experience difficulties with attention, concentration, or staying on task. (See Tr. 42-59.)

Case 1:23-cv-00704-LPA   Document 19   Filed 06/24/24   Page 12 of 38

- "during a July 2021 telehealth visit, [Plaintiff] noted that his sleep, mood, and energy levels were all 'pretty good,' . . . [and] that his concentration was 'OK' but noted some <u>brief</u> periods of distractibility" (<u>id.</u> (emphasis added) (quoting Tr. 412));

- although "the efficacy of [Plaintiff]'s treatment regimen ha[d] been hindered by periods of medication non-compliance[,] . . . at a March 2022 visit . . ., he described his mood as 'fine,' . . . had benign signs including a well-groomed appearance, cooperative attitude, intact orientation, and normal thought content on mental status examination" (<u>id.</u> (quoting Tr. 642-43));

- "at a subsequent August 2022 follow-up visit, [Plaintiff] noted that he was managing his PTSD fairly well[,] . . . [and] that he was taking Adderall to counteract the <u>sedating properties of duloxetine</u> . . . [and, o]n mental status examination, [he] had benign signs including euthymic mood, normal appearance, and intact cognitive function[, and h]e was instructed to <u>discontinue Adderall</u> and begin taking duloxetine at night to decrease daytime drowsiness" (<u>id.</u> (emphasis added) (citing Tr. 823-24));[8]

- "at several visits during December 2022 and January 2023, [Plaintiff] had normal signs on mental status examination including <u>intact concentration</u>, appropriate eye contact, normal speech, and unremarkable thought content" (<u>id.</u> (emphasis added) (citing Tr. 827, 836, 842)).

Those observations cite to substantial evidence supporting the ALJ's determination that, despite Plaintiff's moderate limitation in CPP, he remained able to understand, remember, and carry out

_____

[8] At that visit, Plaintiff "denie[d] that he ha[d] been diagnosed with [Attention Deficit Hyperactivity Disorder ('ADHD')]," and reported that "[w]ithout the stimulant[,] he ha[d] <u>low energy</u> and <u>low motivation</u>." (Tr. 823 (emphasis added).)

13

simple instructions and adapt to occasional change in the work setting (see Tr. 16).

Plaintiff contends that the ALJ erred by "discounting [Plaintiff]'s description of his symptoms because of a supposed lack of abnormal signs on examination." (Docket Entry 12 at 6.) According to Plaintiff, "such analysis runs afoul of Fourth Circuit precedent" (id.) in Arakas v. Commissioner, Soc. Sec. Admin., 983 F.3d 83, 97-98 (4th Cir. 2020), and Shelley C. v. Commissioner of Soc. Sec., 61 F.4th 341, 361-62 (4th Cir. 2023) (see id. at 6-7). Plaintiff notes that, in Arakas, the Fourth Circuit "'h[eld] that ALJs may not rely on objective medical evidence (or the lack thereof) – even as just one of multiple factors – to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence'" (id. at 7 (quoting Arakas, 983 F.3d at 97 (emphasis omitted)) and, in Shelley C., "explicitly extended the *Arakas* reasoning to include psychological disorders, depression in particular" (id. (citing Shelley C., 61 F.4th at 361-62)). Plaintiff further notes that, "amongst the 'objective evidence' the [Fourth Circuit] found improper for ALJs to rely upon to dismiss the severity of depressive symptomology were notations on [mental status examinations] of 'good attention and concentration at treatment visits,'" finding that "'reasoning [] not only defective, but also

14

insupportably weak.'"  (Id. at 8 (quoting Shelley C., 61 F.4th at 367).)

In Arakas, the Fourth Circuit deemed fibromyalgia a "unique" disease, Arakas, 983 F.3d at 97, with "symptoms [that] are entirely subjective," id. at 96, and noted that "physical examinations of patients with fibromyalgia will usually yield normal results — a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions," id. (brackets omitted).  The Fourth Circuit thus held that "ALJs may not rely on objective medical evidence (or the lack thereof) – even as just one of multiple medical factors – to discount a claimant's subjective complaints regarding symptoms of fibromyalgia," because "[o]bjective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease," id. at 97 (emphasis added).

Just over two years later, the Fourth Circuit issued Shelley C., in which the court extended the above-described holding in Arakas to depression, reasoning as follows:

> After acknowledging that [the plaintiff]'s medically determinable impairment could reasonably be expected to cause some of the alleged symptoms, the ALJ determined that [the plaintiff]'s statements relating to the intensity, persistence, and limiting effect of her symptoms were inconsistent with the medical and other evidence in the record.  We hold that the ALJ erred in discounting [the plaintiff]'s subjective complaints as inconsistent with the record's medical evidence.

15

The ALJ's legal error is clear: he could not dismiss [the plaintiff]'s subjective complaints based *entirely* upon the belief that they were not corroborated by the record's medical evidence. The Fourth Circuit has long held that "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). Indeed, "[b]ecause pain is not readily susceptible of objective proof . . ., the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative." *Hines v. Barnhart*, 453 F.3d 559, 564-65 (4th Cir. 2006). Accordingly, [the plaintiff] was entitled to rely entirely on subjective evidence to demonstrate that her pain was sufficiently persistent and severe to support a disability finding. *See id.* at 564. As described in length above, the record contains no shortage of such evidence.

. . .

In *Arakas*, we held that ALJs could not rely upon the absence of objective medical evidence to discredit "a claimant's subjective complaints regarding symptoms of fibromyalgia *or some other disease that does not produce such evidence*." 983 F.3d at 97 (emphasis added). Today, we hold that depression — particularly chronic depression — is one of those other diseases. . . . Stated differently, symptoms of [major depressive disorder ('MDD')], like those of fibromyalgia, are "entirely subjective," determined on a case-by-case basis. *Arakas*, 983 F.3d at 96 (emphasis added). Ultimately, because of the unique and subjective nature of MDD, subjective statements from claimants "should be treated as evidence *substantiating* the claimant's impairment." *Id.* at 97-98.

Because the ALJ "improperly increased [the plaintiff]'s burden of proof," *id.* at 96, in requiring that her subjective statements be validated by objective medical support, we must find error.

Shelley C., 61 F.4th 341, 360-62 (italics in original) (internal

quotation marks, footnote, and some citations omitted).

16

Plaintiff's argument under <u>Arakas</u> and <u>Shelley C.</u> fails for three reasons.

First, to the extent Plaintiff relies on <u>Arakas</u> and <u>Shelley C.</u> to fault the ALJ for considering objective findings on mental status examinations at <u>step three</u> of the SEP (<u>see</u> Docket Entry 12 at 6 (faulting ALJ for relying on "'benign signs'" in mental status examinations at step three of SEP (quoting Tr. 15))), that argument overextends the reach of those cases. In each of those cases, the Fourth Circuit held that an ALJ may not, <u>when determining a claimant's RFC</u>, discount a claimant's subjective reports of the intensity, persistence, and limiting effects of his or her fibromyalgia or MDD symptoms <u>entirely</u> on the basis of the absence of substantiating objective medical evidence. <u>See</u> <u>Shelley C.</u>, 61 F.4th at 361; <u>Arakas</u>, 983 F.3d at 97. Thus, those cases did <u>not</u> affect the regulatory requirements that a claimant must demonstrate <u>objective</u> findings satisfying the criteria of an applicable listing at step three of the SEP, 20 C.F.R. § 404.1525(c)(3) ("Within each listing, [the SSA] specif[ies] the <u>objective medical</u> and other findings needed to satisfy the criteria of that listing." (emphasis added)). The Court accordingly finds no error arising out the ALJ's reliance on unremarkable objective findings in Plaintiff's mental status examinations as part of the ALJ's analysis at step three of the SEP (<u>see</u> Tr. 14-16).

17

Second, none of Plaintiff's providers diagnosed Plaintiff with MDD or any other depressive disorder (see generally Tr. 316-842; see also Tr. 440 (reflecting Plaintiff's sole mental diagnosis as PTSD and expressly denying other diagnoses)), and, their treatment notes reflect that Plaintiff generally did not report significant depressive symptoms (see Tr. 370 (Patient Health Questionnaire - 9 ("PHQ-9") revealing "mild" depressive symptoms)),[9] 412 (Plaintiff's description of mood as "good"), 446 (Plaintiff's denial of problems with mood), 458 (Plaintiff's report of "better mood"), 466 (Plaintiff's report of "coup[l]e days of sadness since the last appointment"), 485 (Plaintiff's notation of "good mood"), 603 (PHQ-9 showing "moderate" depressive symptoms), 823 (Plaintiff's denial of depression), 841 (Plaintiff's complaint of feeling "a little depressed over last two days" (emphasis added))).

The absence of a depressive disorder distinguishes this case from Shelley C., a case which involved the following facts:

- the plaintiff's "long-time treating psychiatrist . . . diagnosed [the plaintiff] with

---

[9] "The [PHQ]-9 is a self-administered scale that helps clinicians assess for depression. *Patient Health Questionnaire (PHQ-9 & PHQ-2)*, AM. PSYCHOL. ASS'N, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health (last visited Feb. 6, 2020). The nine items on the scale incorporate depression criteria from the [Diagnostic and Statistical Manual of Mental Disorders (Am. Psychiatric Ass'n 4th ed. 1994) ('DSM-IV')]. *Id.*" Xavier S. v. Saul, No. 1:19CV1195, 2020 WL 1015816, at *16 (E.D. Va. Mar. 2, 2020) (unpublished). The PHQ-9 "scores each of the nine [DSM-IV] criteria as '0' (not at all) to '3' (nearly every day). The total of the nine scores is used to rate the severity of depression. A total score of 0-4 is 'none,' 5-9 is 'mild,' 10-14 is 'moderate,' 15-19 is 'moderately severe,' and 20-27 is 'severe.' http://patient.info/doctor/patient-health-questionnaire-phq-9." Deboard v. Colvin, No. 3:16CV2661, 2017 WL 510743, at *3 (S.D.W. Va. Jan. 18, 2017) (unpublished), recommendation adopted sub nom. Deboard v. Berryhill, 2017 WL 510052 (S.D.W. Va. Feb. 7, 2017) (unpublished).

[MDD], dysthymia, and [attention deficit hyperactivity disorder ('ADHD')]," <u>Shelley C.</u>, 61 F.4th at 347 (emphasis added);

- the plaintiff attempted suicide by "intentionally overdosing on . . . medications" shortly before applying for DIB, <u>id.</u>;

- the plaintiff's "periods of improvement were short-lived," and she "usually spiraled into deepened periods of heightened anxiety and depression mere days after she vocalized her improvement," <u>id.</u> at 348;

- "[b]ecause [the plaintiff's] symptoms continued to waver despite her therapy and constant medication adjustment, [her treating psychiatrist] urged [the plaintiff] to pursue either Electro Convulsive/Shock Therapy ('ECT') or Transcranial Magnetic Stimulation ('TMS') therapy," <u>id.</u> at 349;[10] and

- the plaintiff underwent "36 TMS treatments" but her "positive results were fleeting, and [she] quickly slipped back into a depressive state, plagued with melancholy, lethargy, and self-deprecating thoughts just weeks after finishing her final TMS session," <u>id.</u> at 350.

The Fourth Circuit emphasized that portions of the ALJ's decision "provided a prime example of the misconceptions surrounding <u>depression</u>," <u>id.</u> at 367 (emphasis added), noting that individuals

---

[10] "TMS is a noninvasive procedure that 'uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of depression[.] It is typically used when other depression treatments haven't been effective.'" <u>Shelley C.</u>, 61 F.4th at 349 n.3 (internal brackets and ellipsis omitted) (quoting *Mayo Clinic, Transcranial magnetic stimulation* (Nov. 27, 2018), https://www.mayoclinic.org/tests-procedures/transcranial-magnetic-stimulation/about/pac-20384025). "ECT is given to patients with severe, treatment-resistant depression and is performed under general anesthesia, with 'small electric currents passed through the brain, intentionally triggering a brief seizure. ECT seems to cause changes in brain chemistry that can quickly reverse symptoms of certain mental health conditions.'" <u>Id.</u> (internal ellipsis omitted) (quoting *Mayo Clinic, Electroconvulsive therapy (ECT)* (Oct. 12, 2018), https://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/about/pac-20393894).

with depression can "experienc[e] brief periods of diminished depression, which can appear - from the outside looking in - as overall improvement," id., and that "[t]he ALJ focused on [the plaintiff]'s 'improved' periods to reject the lower, more frequent states of her depression," id. (emphasis added). The Fourth Circuit announced that it would "join [its] sister circuits' growing conversation surrounding chronic diseases, highlighting, in particular, the unique and subjective nature of chronic depression," id. at 368 (emphasis added), found that the plaintiff's MDD met the criteria of Listing 12.04, see id., and "remand[ed] with instructions to grant disability benefits," id. at 369.

Significantly, the Fourth Circuit has not extended its holdings in Arakas and Shelley C. to mental impairments other than MDD/chronic depression. Given the Fourth Circuit's repeated emphasis on the "unique" nature of chronic depression, see id. at 368, and the significant difference between the primary symptoms of PTSD, see Diagnostic and Statistical Manual of Mental Disorders, 271-72 (Am. Psychiatric Ass'n 5th ed. 2013) ("DSM-V") (describing "[e]xposure" to trauma which causes "[r]ecurrent distressing memories" and "dreams," "flashbacks," "[a]voidance," and "alterations in cognitions[, ] mood[,] . . . arousal[,] and reactivity" as primary symptoms), and the primary symptoms of MDD, see DSM-V, 160 (listing "[d]epressed mood most of the day, nearly

20

every day" and "[m]arkedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day" as primary symptoms), the Court finds Shelley C. distinguishable from the instant case.

Third, the ALJ here neither relied "entirely" on the absence of objective medical evidence to discount Plaintiff's PTSD symptoms, Shelley C., 61 F.4th at 360 (emphasis omitted), nor "requir[ed]" that objective medical evidence substantiate those symptoms, id. at 362. Rather, the ALJ found that Plaintiff's subjective statements about his symptoms lacked consistency with "the medical evidence and other evidence in the record" (Tr. 17 (emphasis added)), which does not indicate that the ALJ relied "entirely" on objective medical evidence, as "medical evidence" and "other evidence" encompass more than just objective medical evidence. Consistent with that finding, although the ALJ mentioned Plaintiff's "benign" or "normal" objective findings on mental status examinations several times in the ALJ's discussion of the medical evidence (Tr. 15, 17), he additionally considered Plaintiff's consistent reports to his providers of stable, manageable mental symptoms (see Tr. 17),[11] and that "the efficacy

---

[11] Of note, many of the mental status examinations in the record reflect Plaintiff's self-reports of his mood, appetite, concentration, sleep, and energy level. (See, e.g., Tr. 412 ("good mood," "pretty good energy level"), 446 (denial of significant problems with mood), 458 (PTSD "manageable," "better mood," "pretty good concentration," "good appetite," "pretty good sleep"), 466 ("good sleep and mood," "pretty good energy," "better concentration and appetite"), 485 ("better sleep," "good mood," "pretty good energy and concentration," "good appetite"), 564 ("energy fine"), 823 (PTSD and anxiety manageable, denying depression and anger episodes).) Shelley C. does not bar the

21

of [his] treatment regimen ha[d] been hindered by periods of medication noncompliance" (<u>id.</u>).

Shelley C. does not preclude the ALJ from such considerations. As well-explained by another district court in this Circuit:

> Here, the ALJ found [the p]laintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but concluded that [the p]laintiff's statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely consistent with the <u>medical evidence and other evidence in the record</u>. The ALJ here did not base his conclusion on a lack of objective medical evidence. Rather, the <u>ALJ explicitly noted that his step-two conclusion was based on inconsistencies with the medical evidence and other evidence in the record</u>. The ALJ properly weighed [the p]laintiff's subjective complaints against other evidence in the record. For instance, the ALJ compared [the p]laintiff's hearing testimony to her previous statements, including those made during medical visits with her primary care provider and her statements regarding her activities of daily living, including her ability to care for dependent grandchildren and live alone. <u>Such weighing remains permissible under *Shelley C.* and *Arakas*</u>.

<u>Lasharne W. v. Commissioner, Soc. Sec. Admin.</u>, No. CV 21-2603, 2023 WL 2414497, at *4 (D. Md. Mar. 8, 2023) (unpublished) (internal quotation marks and citations omitted); <u>see also</u> <u>Anthony P. v. O'Malley</u>, No. 1:22CV291, 2024 WL 965608, at *3 (E.D. Va. Mar. 6, 2024) (unpublished) ("[T]he ALJ in this case did not dismiss [the

---

ALJ from considering those <u>subjective</u> components of a mental status examination. <u>See, e.g.</u>, <u>Shelby D. v. Kijakazi</u>, No. 3:22CV234, 2023 WL 6444895, at *11 (S.D.W. Va. Sept. 29, 2023) (unpublished) (finding ALJ "properly noted that [the plaintiff]'s own *subjective* presentation in mental-status examinations was unremarkable" (emphasis in original)).

p]laintiff's subjective complaints based entirely upon the belief that they were not corroborated by the medical evidence; nor did the ALJ require that [the p]laintiff's subjective statements be validated by objective medical support. Rather, in assessing [the p]laintiff's subjective complaints, the ALJ considered [the p]laintiff's ability to complete a myriad of daily activities, [his] own statements about his condition, and [his] treating provider's observations of [the p]laintiff's functioning. Fourth Circuit precedent does not suggest that ALJs should ignore objective evidence such as this; instead, *Shelley C.* and *Arakas* prevent ALJs from requiring claimants to provide medical evidence that would be impossible to produce given their specific medical conditions. The ALJ weighed the [p]laintiff's subjective complaints appropriately under those holdings and did not impose undue demands."); Strader v. O'Malley, No. 5:22CV367, 2024 WL 796523, at *8 (E.D.N.C. Feb. 2, 2024) (unpublished) ("[C]ontradictory medical or other evidence may discredit [the p]laintiff's subjective statements regarding the limiting effects of her [symptoms], [while] a mere absence of medical evidence cannot." (emphasis added) (citing Shelley C., 61 F.4th at 360)), recommendation adopted, 2024 WL 779225 (E.D.N.C. Feb. 26, 2024) (unpublished); Shelby D. v. Kijakazi, No. 3:22CV234, 2023 WL 6444895, at *11 (S.D.W. Va. Sept. 29, 2023) (unpublished) ("[A] diagnosis of . . . depression does not render a claimant per se

23

disabled. . . . The ALJ expressly stated that his conclusions were not based exclusively on objective medical findings, but included consideration of the total medical and nonmedical evidence, including testimony and statements by [the plaintiff] and others, a function report, and other record evidence regarding [the plaintiff]'s activities of daily living, behavior and habits. The ALJ supported this assertion by pointing to extensive record evidence of inconsistencies with [the plaintiff]'s allegations regarding the limiting effects of these impairments." (internal quotation marks and parenthetical citation omitted)).

In short, Plaintiff has not shown that the ALJ erred under <u>Mascio</u>, and, thus, his first issue on review fails as a matter of law.

### 2. Conflict Between VE's Testimony and the <u>DOT</u>

Plaintiff's second and final assignment of error maintains that "[t]he ALJ failed to identify and provide a reasonable explanation resolving the conflict between the testimony of the VE and the [<u>DOT</u>] regarding the frequency of changes involved in the jobs cited at [s]tep [f]ive of the SEP." (Docket Entry 12 at 9 (bold font and block formatting omitted); <u>see also</u> Docket Entry 14 at 1-4.) More specifically, Plaintiff contends that "an apparent conflict [exists] between the VE's testimony that" an individual (like Plaintiff (<u>see</u> Tr. 16)) limited to "'*occasional* changes in a routine work setting'" could perform the jobs of merchandise

24

marker, mail sorter, and routing clerk (Docket Entry 12 at 9 (quoting Tr. 63) (emphasis supplied by Plaintiff)), and the DOT's categorization of those jobs at Reasoning Development Level ("RDL") 2 (id. (citing DOT, No. 209.587-034 ("Marker"), 1991 WL 671802 (G.P.O. 4th ed. rev. 1991), DOT, No. 222.687-022 ("Routing Clerk"), 1991 WL 672133), and DOT, No. 222.587-038 ("Router"), 1991 WL 672123).[12] Plaintiff notes that the DOT defines RDL 2 as requiring workers to "[d]eal with problems involving a few concrete variables in or from standardized situations," and RDL 1 as requiring workers to "[d]eal with *standardized situations with occasional or no variables* in or from these situations" (id. (quoting DOT, App'x C ("Components of the Definition Trailer"), § III ("General Educational Development (GED)"), 1991 WL 688702) (emphasis supplied by Plaintiff)), and, thus, reasons that the RFC's limitation to occasional changes in a routine work setting apparently conflicts with the RDL 2 jobs cited by the VE and adopted by the ALJ at step five (see id.). According to Plaintiff, other "courts have concurred" with his position. (Id. (citing Austin v. Berryhill, No. 1:17CV1797, 2018 WL 2392209, at *20 (D.S.C. Apr. 24, 2018) (unpublished), recommendation adopted, 2018 WL 2389595 (May 24, 2018) (unpublished), and Watts v. Berryhill, No. 1:17CV127, 2017 WL

_____

[12] The job to which the VE referred as "mail sorter" (Tr. 63) corresponds to the DOT job "Routing Clerk," DOT, No. 222.687-022, 1991 WL 672133 (noting that job may involve "sort[ing] sacks of mail and be known as Mail Sorter"), and the job the VE identified as "routing clerk" (Tr. 63) corresponds to the DOT job "Router," DOT, No. 222.587-038, 1991 WL 672123 (listing "[a]lternate [t]itle[]" as "Routing Clerk").

25

4325685, at *12 (D.S.C. Sept. 12, 2017) (unpublished), recommendation adopted, 2017 WL 4296722 (D.S.C. Sept. 26, 2017) (unpublished)); see also Docket Entry 17 (citing Hall v. O'Malley, No. 7:23CV651, slip op. (E.D.N.C. Mar. 19, 2024).) Those contentions fall short.

Social Security Ruling 00-4p, Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (Dec. 4, 2000) ("SSR 00-4p") places an affirmative duty on an ALJ to elicit an explanation from the VE as to any "apparent unresolved conflict" between the VE's testimony and the DOT:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the [DOT]. When there is an apparent unresolved conflict between VE . . . evidence and the [DOT], the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the [ALJ's] duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2 (emphasis added). Moreover, "an ALJ has not fulfilled his affirmative duty merely because the [VE] responds 'yes' when asked if her testimony is consistent with the [DOT]," Pearson v. Colvin, 810 F.3d 204, 208 (4th Cir. 2015) (internal quotation marks omitted); thus, "[t]he ALJ independently must identify . . . where the [VE's] testimony seems to, but does

26

not necessarily, conflict with the [DOT]," id. at 209 (emphasis added); see also id. (rejecting the Commissioner's argument that an "apparent" conflict meant only an "obvious" one).

In this case, the ALJ queried the VE whether any light-exertion jobs existed for an individual with Plaintiff's age, education, and work history, and who, as relevant here, could handle only "occasional changes in a routine work setting." (Tr. 62-63.) In response, the VE opined that such an individual could perform the jobs of merchandise marker, mail sorter, and routing clerk, and provided the corresponding DOT codes for the three jobs, as well as their incidence in the national economy. (See Tr. 63.) The ALJ additionally asked the VE whether "[he]r testimony [was] consistent with the [DOT]," and the VE responded affirmatively "with one exception[ that t]he [DOT] . . . d[id not] address interaction with others, including supervisors, coworkers, and the public," and that, as to that subject, "[she] relied on [her] education, training, knowledge, and experience." (Tr. 62.) On cross-examination, Plaintiff's counsel did not question the VE about any apparent conflict between the dispositive hypothetical question's limitation to "occasional changes in a routine work setting" (Tr. 63) and the DOT's classification of the three jobs the VE cited as RDL 2, see DOT, No. 209.587-034 ("Marker"), 1991 WL 671802; DOT, No. 222.687-022 ("Routing Clerk"), 1991 WL 672133; DOT, No. 222.587-038 ("Router"), 1991 WL 672123. (See Tr. 64-65.)

27

The ALJ subsequently adopted the VE's testimony to find, at step five of the SEP, that "[Plaintiff wa]s capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy" (Tr. 22). More specifically, the ALJ explained as follows:

> To determine the extent to which [the RFC's non-exertional limitations] erode the unskilled light occupational base, the [ALJ] asked the [VE] whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and [RFC]. The [VE] testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:
>
> 1. Merchandise marker ([DOT] # 209.587-034): light, unskilled with a[ Specific Vocational Preparation ('SVP')] of two. There are approximately 124,000 of these jobs in the national economy.
> 2. Mail sorter ([DOT] # 222.687-022): light, unskilled with an SVP of two. There are approximately 97,000 of these jobs in the national economy.
> 3. Routing clerk ([DOT] # 222.587-038): light, unskilled with an SVP of two. There are approximately 34,000 of these jobs in the national economy.
>
> The [VE]'s testimony is well supported and consistent with the [DOT] except with regard to any non-exertional limitations that are not specifically addressed by the [DOT] (SSR 00-4p). The [VE] relied upon her education and experience in assessing the vocational impact of such restrictions.

(Id. (emphasis added) (internal parenthetical citation omitted).) As the above-quoted language makes clear, neither the ALJ nor the VE identified a conflict between the limitation to "occasional

28

changes in a routine work setting" (Tr. 63) and the DOT's classification of the three jobs as RDL 2.

In response, the Commissioner argues that, "[a]s threshold matter, the Court should not consider Plaintiff's challenge because he failed to pursue it during the administrative hearing," and notes that "[t]he practice of holding back clarifying questions from the [VE] to save issues for appeal is strongly disfavored." (Docket Entry 13 at 16 (citing Wesley v. Kijakazi, No. 1:20CV364, 2021 WL 4129234, at *4 (M.D.N.C. Sept. 9, 2021) (unpublished), recommendation adopted, slip op. (M.D.N.C. Oct. 14, 2021) (Tilley, S.J.), and Bunton v. Colvin, No. 1:10CV786, 2014 WL 639618, at *5 (M.D.N.C. Feb. 18, 2014), recommendation adopted, slip op. (M.D.N.C. Mar. 10, 2014) (Schroeder, J.)).)

The Commissioner's reliance on Wesley and Bunton misses the mark, because, in Wesley, the plaintiff contended "that the ALJ erred by failing to resolve an internal conflict in the VE's testimony," Wesley, 2021 WL 4129234, at *4 (emphasis added), and in Bunton, the plaintiff's counsel failed to cross-examine the VE regarding the plaintiff's ability to perform three light-exertion jobs, see Bunton, 2014 WL 639618, at *5. Thus, in neither case did the plaintiff argue that an apparent conflict existed between the VE's testimony and the DOT. See Wesley, 2021 WL 4129234, at *4; Bunton, 2014 WL 639618, at *5. Indeed, in finding the plaintiff's argument forfeited, the Court in Wesley expressly noted that "[SSR

00-4p] d[id] not alter the Court's forfeiture analysis[, because that Ruling] places an <u>affirmative duty</u> on an ALJ to <u>independently</u> elicit an explanation from the VE as to any '<u>apparent unresolved conflict</u>' between the VE's testimony and the [<u>DOT</u>]," <u>id.</u> at \*6 (quoting SSR 00-4p, 2000 WL 1898704, at \*2) (emphasis in <u>Wesley</u>), and further observed that "[the p]laintiff ha[d] not . . . identified any authority burdening the ALJ with an independent, affirmative duty to identify and resolve <u>all possible internal inconsistencies</u> in the VE's testimony and/or precluding waiver/forfeiture outside the context of SSR 00-4p." <u>Id.</u> (emphasis in original); <u>see also</u> <u>Weaver v. Colvin</u>, No. 1:10CV582, 2013 WL 3989561, at \*12 (M.D.N.C. Aug. 2, 2013) (unpublished) (Webster, M.J.) (holding that, under SSR 00-4p, "a claimant does not forfeit or waive her right to raise th[e ] issue [of an apparent conflict between the VE and the <u>DOT</u>] before the district court if the claimant failed to raise it at the ALJ hearing"), <u>recommendation adopted</u>, 2013 WL 4768178 (M.D.N.C. Sept. 5, 2013) (unpublished) (Eagles, J.). Accordingly, Plaintiff has not forfeited his right to raise his SSR 00-4p-based apparent conflict argument in this Court.

With regard to the merits of Plaintiff's arguments, the Commissioner discounts the "persuasive value" of the <u>Austin</u> and <u>Watts</u> cases relied upon by Plaintiff, because those cases lacked adequate explanations for "*why* a[n RDL 2] job would require more

30

than 'occasional changes' in the workplace setting." (Docket Entry 13 at 21 (citing <u>Austin</u>, 2018 WL 2392209, at *20, and <u>Watts</u>, 2017 WL 4325685, at *12) (emphasis supplied by the Commissioner).) The Commissioner further points out that other courts have offered "reasoned analyses . . . rejecting the precise challenge Plaintiff makes here." (<u>Id.</u> at 23; <u>see also</u> <u>id.</u> at 22-23 (citing <u>Ward v. Commissioner of Soc. Sec.</u>, No. CV-21-8029, 2023 WL 2425016, at *5 (D. Az. Mar. 9, 2023) (unpublished), <u>aff'd</u>, <u>Ward v. O'Malley</u>, No. 23-15541, 2024 WL 1108573 (9th Cir. Mar. 14, 2024) (unpublished), <u>Lorain Ann S. v. Kijakazi</u>, No. 5:21CV436, 2022 WL 5238147, at *4 (C.D. Cal. Aug. 31, 2022) (unpublished), <u>aff'd</u>, <u>Stiffler v. O'Malley</u>, No. 22-55906, ___ F.4th ___, 2024 WL 2715884 (9th Cir. 2024), <u>Kelly P. v. Saul</u>, No. 5:18CV777, 2019 WL 3573591, at *5 (C.D. Cal. Aug. 6, 2019) (unpublished), and <u>Cromwell v. Colvin</u>, No. 7:13CV186, 2015 WL 103891, at *6 (E.D.N.C. Jan. 7, 2015) (unpublished)); Docket Entry 16 (citing <u>Challenger v. O'Malley</u>, No. 5:23CV485, 2024 WL 1674513 (E.D.N.C. Apr. 18, 2024) (unpublished)).)

The Court finds the reasoning in the very recent, published decision by the Ninth Circuit in <u>Stiffler</u> persuasive on this issue. That court offered the following rationale for finding no apparent

conflict between a limitation to "few workplace changes"[13] and jobs

rated at RDL 2:

> [T]his case turns on the distinction between limitations in the <u>workplace environment</u>, and limitations on the <u>tasks</u> performed. Contrary to [the plaintiff]'s proposition, there was no conflict between [her] limitation of "few workplace changes" and inclusion of "the ability to deal with problems involving few concrete variables" in [RDL] 2. The capacity to "deal with problems involving a few concrete variables in or from standardized situations," identified in [RDL] 2, refers to the "situational variables" that may arise when performing an assigned <u>task</u>. *Zavalin[ v. Colvin*, 778 F.3d 842,] 848 [(9th Cir. 2015)]. For example, *Zavalin* explained that a cashier may be confronted with varying situations in the course of "reconciling the cash on hand against the cash register's tape and issuing credit memorandums to customers." *Id.*

> On the other hand, the ALJ's reference to an "environment with few workplace changes" concerns broader revisions to the <u>workplace environment</u>. The applicable regulation explains that performance of a job often requires "[d]ealing with changes in a routine work setting," so the inquiry into whether a claimant has an impairment that limits the ability to do basic work activities involves considering to what extent the claimant is able to adapt to changes in the "work setting." 20 C.F.R. § 404.1522(b)(6). As the Supreme Court has explained in another context, "[t]he workplace includes those areas and items that are related to work and are generally within the employer's control." *O'Connor v. Ortega*, 480

---

[13] Plaintiff emphasizes in his Reply that <u>Stiffler</u> "does not deal with the issue at bar as it uses the word 'few' with respect to changes as opposed to 'occasional' and . . . a few variables in the work setting is the language of [RDL 2] jobs." (Docket Entry 14 at 3.) That difference in terminology, however, fails to defeat the relevance of <u>Stiffler</u>'s holding, because that court's analysis did not turn on the existence of the word "few" in both the RFC limitation and the definition of RDL 2 but, rather, on the distinction between the RFC's limitation of changes in "the <u>workplace environment</u>" and RDL 2's limitation of variables in the "<u>tasks</u> performed," <u>Stiffler</u>, ___ F.4th at ___, 2024 WL 2715884 at *6 (emphasis added). Consistent with that understanding, the Ninth Circuit, in an unpublished decision, has also held that no apparent conflict existed between a limitation to "<u>occasional</u> routine changes in the work setting" and RDL 2 jobs. <u>Ward</u>, No. 23-15542, 2024 WL 1108573, at *1 (emphasis added).

32

> U.S. 709, 715 (1987). The workplace environment or
> setting would generally include, for example, the
> location or physical surroundings of the area where the
> worker's duties are performed. . . .
>
> By way of example, the Supreme Court in *O'Connor*
> referenced a hospital and described the "hallways,
> cafeteria, offices, desks, and file cabinets" as "all
> part of the workplace." *Id.* at 716. Changes to the
> workplace setting itself – such as requiring workers to
> work in a different area of the workplace each day or to
> travel to different locations for each shift – are
> distinct from "*situational* variables" in the tasks being
> performed. *Zavalin*, 778 F.3d at 848 (emphasis added).
>
> Considering the distinction between "an environment with
> few workplace changes" and "few variables" in the work to
> be performed, there was no apparent conflict for the ALJ
> to resolve between the testimony of the [VE] and the
> [<u>DOT</u>]. *See Zavalin*, 778 F.3d at 846.

<u>Stiffler</u>, ___ F.4th at ___, 2024 WL 2715884 at *6 (underscoring

added) (parallel citations omitted); <u>see also</u> <u>Ward</u>, 2024 WL

1108573, at *1 ("'Work *setting*' changes could be broader and more

comprehensive than 'variables in [] *situations* encountered on the

job.' Thus, the ability to handle 'occasional routine changes in

the work setting' may exceed [RDL 1]." (emphasis in original));

<u>Challenger</u>, 2024 WL 1674513, at *3 ("The[] general definitions of

[RDL] 1 and 2 say nothing about changes in <u>work setting</u>." (emphasis

added)); <u>Stephen G. F. v. O'Malley</u>, No. 2:22CV2006, 2024 WL

1051808, at *5-6 (D. Nev. Mar. 11, 2024) (unpublished) ("[Courts]

do not mechanically match words from the ALJ's limitation to a

given [RDL]. Thus, the fact that the ALJ used the phrase

'occasional changes in the workplace' in his limitation does not

automatically limit [the p]laintiff to [RDL] 1 jobs simply because

33

[ RDL] 1 uses the word 'occasional.' . . . The ultimate question is whether a person who is limited to only dealing with 'occasional changes in the workplace' is precluded from carrying out the <u>functions</u> of a job that may require dealing with 'a few concrete variables.' The cases [reviewed by the court] suggest the answer is 'no.' As a result, there was no need for additional questioning of the VE. In turn, the ALJ's acceptance of the VE's testimony was appropriate because there was no apparent conflict[.]" (emphasis added)).

In contrast, as the <u>Challenger</u> case recognizes, "the [<u>Austin</u> and <u>Watts</u>] cases upon which Plaintiff relies do not explain the alleged equivalency [between occasional workplace changes and RDL 1]: *Austin* simply concludes that 'the ALJ's specification that Plaintiff could exercise occasional independent judgment skills and deal with occasional workplace changes <u>seems</u> to be most consistent with work at [RDL 1],' *Austin*, 2018 WL 2392209, at *20, and *Watts* does the same, *Watts*, 2017 WL 4325685, at *12," and "the court in both of those cases couched its finding in notably hesitant language[.]" <u>Challenger</u>, 2024 WL 1674513, at *4 (emphasis added).

Moreover, the <u>Hall</u> case cited by Plaintiff (see Docket Entry 17) fails to persuade the court for two reasons. First, the court in <u>Hall</u> noted that "[t]he Fourth Circuit ha[d] not yet addressed" the issue in question, and relied on <u>Watts</u>, a case from the District of <u>South Carolina</u>, to hold that "[a] limitation to

34

occasional judgment and workplace changes is more analogous to [RDL 1] work," Hall, No. 7:23CV651, slip op at 16 (citing Watts, 2017 WL 4325685, at *12), but, notably, did not discuss the Cromwell decision, in which another judge from the Eastern District of North Carolina had earlier held that "no apparent inconsistency [existed] in the VE's expert and reasoned conclusion that a job involving [an even higher reasoning level, i.e., RDL 3] would also be characterized by only occasional changes in the work setting," Cromwell, 2015 WL 103891, at *6 (emphasis added).  In comparison, the more recent Challenger decision expressly relied upon Cromwell in finding no apparent conflict existed between a limitation to occasional workplace changes and RDL 2.  See Challenger, 2024 WL 1674513, at *3.  Second, after finding occasional workplace changes "more analogous to [RDL 1] work," the Hall court stated that "it is arguable that managing matters with 'few concrete variables' [as RDL 2 requires] may exceed an ability to use occasional judgment or having occasional workplace changes."  Hall, No. 7:23CV651, slip op at 16 (emphasis added).  The Fourth Circuit in Pearson made clear, however, that SSR 00-4p does not require an ALJ to identify and resolve such merely "possible" conflicts between the VE and the DOT, Pearson, 810 F.3d at 209 ("recogniz[ing] that th[e court's] conclusion rejects . . . [the plaintiff]'s contention that all possible conflicts must be identified and resolved" (emphasis added).

35

In Plaintiff's Reply, he posits that "the question before this Court is whether hairs should be split between the definitions of the word 'variables' and the word 'changes' (Docket Entry 14 at 3), and notes that "Merriam Webster defines the adjective 'variable' as 'able or apt to vary; subject to variation or changes' and its noun form is 'something that is variable'" (id. at 3-4 (citing https://www.merriam-webster.com/dictionary/variable)), and that "[t]he concept of 'variation' itself is also defined as 'a measure of the change' in scientific data, or in music as 'a repetition in modern ballet of a movement sequence with changes'" (id. at 4 (citing https://www.merriam-webster.com/dictionary/variation)). In Plaintiff's view, "the word 'variables' as used by the [DOT] and the word 'changes' as used by the ALJ have the same meaning in the English language." (Id.)

Plaintiff's argument fails, because it focuses on the wrong comparison. None of the cases cited here finding no apparent conflict between a limitation to occasional changes in the work setting and RDL 2 (or RDL 3) jobs found that the definition of the word 'variables' differed from that of "changes." See Stiffler, ___ F.4th at ___, 2024 WL 2715884 at *6; Ward, 2024 WL 1108573, at *1; Challenger, 2024 WL 1674513, at *3; Stephen G. F., 2024 WL 1051808, at *5-6; Cromwell, 2015 WL 103891, at *6. Moreover, most of those cases instead observed that a limitation to occasional changes in the work setting dealt with the broader context of

36

alterations to the work environment, whereas RDL 2's description of "a few concrete variables in or from standardized situations," DOT, App'x C, § III, 1991 WL 688702, involved the more narrow issue of permutations in the job's tasks, see Stiffler, ___ F.4th at ___, 2024 WL 2715884 at *6 ("The capacity to 'deal with problems involving a few concrete variables in or from standardized situations,' identified in [RDL] 2, refers to the 'situational variables' that may arise when performing an assigned task. . . . On the other hand, the ALJ's reference to an 'environment with few workplace changes' concerns broader revisions to the workplace environment." (emphasis added)); Ward, 2024 WL 1108573, at *1 ("'Work setting' changes could be broader and more comprehensive than 'variables in [] situations encountered on the job.'" (emphasis in original)); Challenger, 2024 WL 1674513, at *3 ("The[] general definitions of [RDL] 1 and 2 say nothing about changes in work setting." (emphasis added)); Stephen G. F., 2024 WL 1051808, at *5-6 ("The ultimate question is whether a person who is limited to only dealing with 'occasional changes in the workplace' is precluded from carrying out the functions of a job that may require dealing with 'a few concrete variables.'" (emphasis added)).

Put simply, Plaintiff's second issue on review fails to demonstrate that the ALJ violated SSR 00-4p and/or Pearson.

37

## III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED,** and that this action is **DISMISSED** with prejudice.

_____
/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

June 24, 2024

38